[No. 13440. Department Two. October 28, 1916.]

JAMES E. FAUCETT, *Respondent*, v. NORTHERN CLAY
COMPANY, *Appellant*.[1]

CANCELLATION OF INSTRUMENTS — CONTRACTS — FRAUD IN PROCURE-
MENT—EVIDENCE—SUFFICIENCY—REPUDIATION—LACHES. A decree can-
celling a contract for fraud in its procurement cannot be sustained
upon findings that the plaintiff was a man of advanced years, poor
eyesight, very hard of hearing, dull of comprehension and worn out
with importunities, where the contract was fair in every respect,
there was no evidence that plaintiff had any infirmity affecting his
ability to contract, and, although a man of considerable experience,
he took no steps to repudiate it while valuable improvements were
being made in reliance upon it, and his testimony was overcome by
that of his adversaries; since fraud in the procurement of a contract
between competent persons must be proved by strong and convincing
evidence, and repudiation must be made promptly under circum-
stances consistent with good faith.

Appeal from a judgment of the superior court for King
county, Mackintosh, J., entered December 31, 1915, upon
findings in favor of the plaintiff, after a trial before the court
and an advisory jury. Reversed.

*Milo A. Root, I. B. Knickerbocker*, and *Paul B. Phillips*,
for appellant.

*M. E. Brewer* and *Jno. Mills Day*, for respondent.

CHADWICK, J.—This case was considered by this court,
and opinion rendered that the contract relied on by appellant
and sought to be cancelled and set aside upon the ground of
fraud in its procurement was not void for uncertainty. The
case was remanded for judgment unless respondent, upon the
issues joined, sustained his charge of fraud. *Faucett v.
Northern Clay Co.*, 84 Wash. 382, 146 Pac. 857. The con-
tract is fully set out in our former opinion. The case came
on for trial. A jury was called to advise the court by its
verdict. A verdict in favor of respondent and for $250
damages was returned. The court adopted the verdict in so

[1]Reported in 160 Pac. 643.

far as it declared the ultimate fact, and made findings and conclusions. A decree was entered cancelling the contract.

The case is here for trial *de novo*. Appellant contends that respondent has failed to sustain the burden of proof, or to show by even a bare preponderance of the testimony that it was guilty of any fraud in the procurement of the contract. The facts, in so far as we shall discuss them, should be considered in the light of the holding of the court when overruling a motion for judgment *non obstante*. The court said:

"The court being fully advised in the premises, and the court having announced its finding that the plaintiff did not prove all of his allegations of fraud in the amended complaint, and that there was in fact no wilful or conscious fraud perpetrated upon the plaintiff on January 24, 1910, either by Paul S. MacMichael, the defendant corporation's president, or Paul B. Phillips, its attorney, in obtaining the contract between the plaintiff and the defendant of that date; and that the contracts in evidence as "Plaintiff's Exhibit A" and "Defendant's Exhibit 4" are the contracts actually signed by the plaintiff on January 24, 1910, and that there was no forgery or alteration of said contracts embodied in said exhibits by the defendant or any one on its behalf; and the court finding that the contract of January 24, 1910, was fully read to the plaintiff prior to the execution of the same; and the court finding that the plaintiff is a man of low mentality and that on January 24, 1910, he gave his consent to the terms of said contract because he was worn out by the importunities of defendant and did not meet the defendant's representatives on equal terms, and was thus overreached by defendant, and would not have signed the contract embodied in said exhibits if he had consulted an attorney at the time he signed said instruments, and the court deeming that such was the interpretation of the evidence also adopted by the jury, and the court deeming that said motion for judgment for the defendant should be denied; Now Therefore," etc.

And in the light of the formal findings of fact:

"That on said January 24th, 1910, said MacMichael and said Phillips, representing the defendant corporation, called

upon plaintiff and represented to the plaintiff that said defendant corporation needed about four (4) acres of the ground covered by said lease to said Itabashi, for use in connection with its said plant, and requested plaintiff to consent to allow said Itabashi to sublease such amount of land near the factory of defendant to defendant; that plaintiff thereupon agreed to permit said Itabashi to sublease about four acres of land to the defendant corporation, and the said MacMichael and said Phillips prepared an instrument in writing; that said instrument was prepared in duplicate in long hand by the said Phillips, and was then and there signed by the plaintiff in person and by the said Paul S. MacMichael on behalf of the said defendant; that before said papers were so signed, the said Paul B. Phillips undertook to read the said papers and explain the same to the plaintiff; that the papers were signed at about the hour of 9 o'clock in the evening of said day; that the said Paul B. Phillips and the said MacMichael had spent the whole of said day from about the hour of 9 a. m. until the signing of said papers with the plaintiff and with his mother, who was a woman of advanced years, at their home, and that the said Paul B. Phillips and the said Paul S. MacMichael had gained the confidence of the said plaintiff and his said mother during said time; that the plaintiff did not read the same; that he was at said time, and is, as appears from the evidence and from his appearance and conduct upon the witness stand, a man of advanced years, poor eyesight, very hard of hearing, dull of comprehension, and with meager training, and that he was worn out by the importunities of said Phillips and the said MacMichael, and that the said papers as read to him by the said Phillips were not understood in their full purport, purpose and meaning by him; that the plaintiff did not understand that he was required to sell said real estate to the defendant at any time; that he did not understand that he was required by said papers to submit any question to arbitration; that he did not understand that he could be compelled to lease the said real estate to the defendant for a term subsequent to the lease of the Japanese, Itabashi; that the said plaintiff did not intend by the signing of said papers that the defendant should have the right to purchase said real estate or to lease said real estate for any term of years beyond the lease of the said Itabashi without his further assent to such subse-

quent lease; that, after the signing of said papers, one copy of the same was left with the said plaintiff and the other taken by the said Phillips for the purpose of placing his notarial seal thereon; that within a few days thereafter the said Phillips, having placed his seal upon the paper taken by him and having had the same recorded, returned a copy of said paper to the said plaintiff and procured from the plaintiff the copy of the paper left with him; that the said plaintiff at all times believed, and had good cause to believe, that the paper signed by him contained only the matters and things to which he had agreed and assented, and that he did not have cause to believe, and did not believe, that said papers required him to sell the real estate therein described, or to lease it for a term subsequent to the lease to said Itabashi; that when said paper was returned to the plaintiff, the plaintiff deposited the same in a trunk in his home, and did not at said time, or prior to said time or subsequent to said time, know or learn of the true and real contents of said instrument until in or about the month of February, 1914, and that said pretended agreement was and is therefore in fraud of plaintiff's rights."

We have read the record with unusual care because of the novel features presented, and we agree with the trial judge that neither the president of appellant nor his attorney was guilty of any conscious fraud upon the rights of respondent. They were seeking to obtain control of land that would in all probability be necessary in the future development of appellant's business. The contract seems fair on its face. It insures respondent a fair rental value so long as it is held under a lease, and a fair price if taken under the option to purchase. Taking the contract by its four corners, it cannot be said that it is unfair or is, in any respect, such a contract as a man of ordinary or even more than ordinary capacity, having regard for his own business welfare, would not have entered into. Nor is it urged that the contract is improvident.

Considering the elementary principles of equity, no reason whatever is shown for the overturning of the contract, unless it be found in the finding that respondent

".  .  . as appears from the evidence and from his appearance and conduct upon the witness stand [is] a man of advanced years, poor eyesight, very hard of hearing, dull of comprehension, with meager training, and that he was worn out by the importunities of said Phillips and the said Mac-Michael, and the said papers as read to him by the said Phillips were not understood in their full purport, purpose and meaning."

When one seeks to set aside a formal written contract upon the ground of fraud he must, as the court in the instant case told the jury, sustain his case by clear and satisfactory proof. We find no better statement of the law in any of the books than was made by the trial judge when instructing the jury:

"Fraud is the foundation of this action. The law presumes, which is a fact, that people, dealing with one another, deal honestly and fairly, and you are to go into this case with that presumption that the parties have dealt fairly and honestly with each other. In other words, never to presume that fraud has taken place. It must be proved to you by the party alleging it; that is, by the plaintiff in this case; by clear and satisfactory proof."

We will consider the findings upon which the decree must rest, in detail. Respondent was "a man of advanced years." There is no testimony to sustain this finding. Respondent had lived on the land since 1865. We do not find that his age is fixed definitely in the record, but he attended the district school from about 1867 or 1868 to 1872 or 1873. Respondent was in the courtroom at the time of the argument of this case, and we, too, have had the benefit of judging "from his appearance." He appears to be a man of about fifty to fifty-five years of age. There is nothing in the record or his appearance to suggest senility. "Advanced years" mean nothing. Many of the world's greatest men have turned the supreme accomplishment of their lives at a time when years, measured by numbers, sat heavily upon them. No neighbor or friend or observer from the wayside, has come with word or fact or opinion to sustain the inference the find-

ing bears that respondent, because of "advanced years," is
weakened in body or mind, or is incapable of attending to his
own affairs.

Neither do we find that respondent had "poor eyesight,"
or is "*very* hard of hearing," or "is dull of comprehension,"
or that "he was worn out with importunities." There is
nothing in the record about poor eyesight, although there is
some evidence from which it may be inferred that he is slightly
deficient in hearing. But he makes no complaint that he did
not hear all that was said, or that he did not comprehend the
contract because he could not see. He says he cannot read.
It, therefore, makes no difference whether his eyesight was
good or bad. His complaint is that that part of the contract
which provides for a renewal of the lease, for sale, and for
arbitration was not read to him at all.

Nor do we find respondent to be a man of low mentality
or dull of comprehension. He makes a fair witness; follows
carefully, and in detail, the theory of his counsel. His testi-
mony is not confused. He seems to appreciate the "finer
points" of his case and can "spar" for advantage. He is
the owner of, and in the active management of, a valuable
farm, a part, or possibly all of which, he has leased to his
profit. He has sold two rights of way over his land, one to
the county, and one to a railroad company; in which all his
legal rights were preserved. No one comes testifying that
respondent is of low mentality or dull of comprehension, or
otherwise incapable of attending to his business in a shrewd
and careful manner. No guardian has ever been applied for
to manage his affairs.

We would pervert every rule of evidence if we were to hold
that the finding of low mentality or dullness of comprehension
is sustained. Neither do we find anything to sustain the find-
ing that respondent was worn out by the importunities of
the president of appellant and his attorney. They were ne-
gotiating over a period of twelve hours, it is true, but there
is as much force in this circumstance to sustain the theory

that respondent was not rushed off his feet as that he was overcome and worn out by importunities. Much of the negotiations were with his mother. If he had attended to the matter, the whole thing might have been settled in an hour or two. That he did not, and that the whole of the twelve hours was not devoted to negotiations and importunities calculated to wear out this supposedly weak man, is evidenced by his own account of the day.

"They came at about nine or ten o'clock in the morning and stayed there all day long and had dinner and supper. They talked with me a little and with my mother—all through the day with her. I was working around the place and would come in once in a while and talk. The result was my mother said: 'For God's sake, Jim, don't be hard on them. They want to lease that little piece of land and you have got it leased to this Japanese and ought to let them have it, if you can fix it with the Jap.' I told them the Jap would not stand for it. MacMichael asked if he could fix it up with the Jap if I would lease it, and I said all right, and that was all the talk MacMichael and I had. . . .

"It was immediately after noon that I agreed to let him lease it from the Jap. I went out to work and MacMichael went up town and when he got back he had the papers on the table and Phillips was writing at one end of the table and MacMichael was writing at the other, and talking among themselves there. About between eight and nine o'clock at night Phillips said: 'We have got these papers ready now'; and he told me to go out and bring in the Japanese and he would get him to sign."

The court admitted a great deal of hearsay testimony tending to show that it was the "settled policy" of respondent not to sell any of his land during his lifetime. This would be error calling for a reversal if the decree depended on the verdict alone. We refer to it only because of the holding of the court that respondent would have repudiated his contract if he had consulted a lawyer. His only hope, if he had consulted a lawyer, was in the two things now relied on; that he was worn out by importunities, and that it was his fixed

policy not to sell any of his land. If he had made a full dis-
closure of the facts, a lawyer would have advised him that
the testimony relied on to show a wearing out of the will by
importunities would likely be insufficient to overcome a written
instrument, and that the settled policy theory would not af-
ford a legal ground for rescission.

The case, then, when reduced to its lowest terms, comes
within two very simple rules. The one, that fraud alleged
to have occurred in the procurement of a contract between
competent persons must be proved by strong and convincing
evidence, and that one who would repudiate a formal written
contract as not evidencing the agreement of the parties must
do so promptly and under circumstances consistent with good
faith. These rules are so obviously applicable that they need
no further discussion.

The contract was written in duplicate. It is admitted that
respondent did not read it, but it was read in his presence.
Now, granting that respondent was advanced in years, and
had very poor eyesight, and was very hard of hearing, and
was of low mentality, and was dull of comprehension, and
could not read, he knew his infirmities at the time. Yet he
put the contract, drawn, as he now contends, by parties with
whom he did not want to deal and with whom he was im-
patient and who had admittedly talked about a sale and
arbitration, in his trunk without asking any one to look it
over. After ten days, he exchanged his copy for the one that
had been recorded; put it in his trunk and never consulted it
until appellant claimed its option, four years after the con-
tract was executed. Yet all the time he knew appellant had
paid $250 to the Japanese for a sublease, and he was accept-
ing rent for the property which he knew came from appellant.
He knew that appellant was making valuable and permanent
improvements on its adjacent property. He was no stranger
to lawyers. He dealt through and with lawyers when he
sold the rights of way over his land. One of the attorneys
in the instant case, who lived in the town a quarter of a mile

away, has, since 1911, "performed various legal duties" for respondent.

As against the failure to show a "conscious" intent to defraud, the failure of proof, and all the other circumstances bearing against the contentions of respondent, we have the one fact (if it be a fact) that he cannot read, and the contract was not read, in its entirety, to him. His testimony is overcome by the evidence of his adversaries, as well as by the circumstances and probabilities of the case.

As we said in *Sahlin v. Gregson*, 46 Wash. 452, 90 Pac. 592:

"If this judgment is permitted to stand, deeds and other written instruments have lost their chief virtue."

And in *Golle v. State Bank of Wilson Creek*, 52 Wash. 437, 100 Pac. 984:

"Furthermore, the failure of the respondent to read the deed or have the same read to him, under the circumstances disclosed by this record, shows such negligence on his part as to place him beyond legal or equitable relief. *Hubenthal v. Spokane & Inland R. Co.*, 43 Wash. 677, 86 Pac. 955."

*Chaffee v. Hawkins*, 89 Wash. 130, 154 Pac. 143, 157 Pac. 35, is also in point.

Reversed, and remanded with instructions to enter a decree in accordance with our former opinion.

MORRIS, C. J., PARKER, and HOLCOMB, JJ., concur.